**KENNETH ROSELLINI**
**ATTORNEY AT LAW**
Ottilio Building
555 Preakness Avenue
Level Two, Four East
Totowa, New Jersey 07512
(973) 998-8375 Fax (973) 998-8376
*Attorney for Plaintiffs, Mohamed Khalil and Sandra Damrah*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MOHAMED KHALIL AND SANDRA DAMRAH,<br><br>  Plaintiff,<br><br>  v.<br><br>THE NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY ("DCP&P") (formerly Division of Youth & Family Services), KARA P. WOOD, in her official capacity as Director of DCP&P, ALLISON BLAKE, in her official capacity as the Commissioner of the Department of Children and Families, KEVIN BELLI, in his individual capacity, GILLIAN BATTS, in her individual capacity, JANET DASILVA, in her individual capacity, ESPERANZA VARGAS, in her individual capacity, ARLENE COHN, in her individual capacity, RACHEL JEWELWICZ-NELSON, in her individual capacity, EZEADI KELECHI, in his individual capacity, ALICE SCHAEFFER NADELMAN, in her individual capacity, GERALDINE LIVENGOOD, in her individual capacity, FAMILY INTERVENTION SERVICES, INC., and John Does 1-15,<br><br>  Defendants. | CIVIL ACTION<br><br>Case No. :<br><br>JURY TRIAL DEMANDED<br><br><br>**VERIFIED COMPLAINT and JURY DEMAND** |

Plaintiffs Mohamed Khalil and Sandra Damrah in the above-captioned matter, by and

through their counsel of record, for their cause of action against Defendants, state as follows:

**PARTIES**

1. Plaintiff, Mohamed Khalil is a resident of New Jersey currently residing in Paterson, New Jersey, and has been a resident of New Jersey at all times relevant to this Complaint.

2. Plaintiff, Sandra Damrah, is a resident of New Jersey currently residing in Woodland Park, New Jersey, and has been a resident of New Jersey at all times relevant to this Complaint.

3. The Defendant, The Division of Child Protection and Permanency ("DCP&P") (formerly the Division of Youth and Family Services, hereinafter referred to at times throughout this complaint as "DYFS"), is New Jersey's child protection and child welfare agency within the Department of Children and Families.

4. The Defendant Kara P. Wood ("Wood") is the current Director of DCP&P and is liable for her actions in her official capacity done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law supervised or controlled one or more of the Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

5. The Defendant Allison Blake ("Blake") is the current Commissioner of the Department of Children and Families and is liable for her actions in her official capacity done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was

acting within the scope of her duties and authority, under color or title of state law supervised or controlled one or more of the Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

6. The Defendant Alice Schaeffer Nadelman ("Nadelman" or "Dr. Nadelman") who, upon information and belief, acted as a psychological expert for DYFS during relevant times to this Complaint, is liable for her acts and omissions in her individual capacity done under color of state law. This Defendant acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

7. The Defendant Rachel Jewelwicz-Nelson ("Nelson" or "Dr. Nelson") who, upon information and belief, acted as a psychological expert for DYFS during relevant times to this Complaint, is liable for her acts and omissions in her individual capacity done under color of state law. This Defendant acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

8. Defendant Kevin Belli ("Belli") is upon information and belief currently employed as a child protective services worker by DCP&P and during relevant times to this Complaint and is liable for his acts and omissions in his individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all times relevant hereto was acting within the scope of his duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

9. Defendant Gillian Batts ("Batts") is upon information and belief currently employed as a child protective services worker by DCP&P and during relevant times to this Complaint and is liable for her acts and omissions in her individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

10. The Defendant Janet Dasilva ("Dasilva") is currently employed as a supervisor of child protective services workers and during relevant times to this Complaint and is liable for her acts and omissions in her individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law supervised or controlled one or more of the Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

11. Defendant Esperanza Vargas ("Vargas") is upon information and belief currently employed as a child protective services worker by DCP&P and during relevant times to this Complaint and is liable for her acts and omissions in her individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the

performance or conduct of their actions.

12. Defendant, Ezeadi Kelechi ("Kelechi") is upon information and belief currently employed as a child protective services worker by DCP&P and during relevant times to this Complaint and is liable for his acts and omissions in his individual capacity done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all times relevant hereto was acting within the scope of his duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

13. The Defendant Arlene Cohn ("Cohn"), who, upon information and belief was the Court appointed Law Guardian for A.R.K., during relevant times to this Complaint and acted as a witness to events set forth in this Complaint, is liable for her acts and omissions in her individual capacity done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

14. The Defendant Geraldine Livengood ("Livengood") who, upon information and belief,  is currently a Deputy Attorney General in the State of New Jersey and during relevant times to this Complaint and acted as a witness to events set forth in this Complaint, is liable for her acts and omissions in her individual capacity done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of

her duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

15. Defendant Family Intervention Services, Inc. ("FIS"), upon information and belief, is a New Jersey Corporation and/or a corporation doing business in the State of New Jersey, that acted as an agent, contractor and/or subcontractor of DYFS at times relevant to this Complaint in supervising the visitation of Mohamed Khalil with his son, acting under the color or title of state law.  This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

16. John Does 1-15 to be named currently as fictitiously named defendants, who in their individual and/or official capacities are liable for their acts and omissions.

**JURISDICTION and VENUE**

17. The jurisdiction of this Court is invoked by Plaintiff pursuant to 28 *U.S.C.* §§1331, 1333, 1343  and 1367  which confer original jurisdiction upon the Court on the grounds that the instant action arises under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, as amended, 42 *U.S.C.* §§1981, 1983, 1985, 1986 and 1988, and Title II of the Americans with Disabilities Act (42 *U.S.C.* §§12131-12165).

18. Venue in the New Jersey District is properly laid pursuant to 28 U.S.C. §1391, in so far as the following alleged unlawful conduct complained of in this Complaint, which forms the factual and legal basis of the claims of the Plaintiff, arose within the geographical limits of this District.

## FACTUAL BACKGROUND

19. On June 27, 2003, Mohamed Khalil and D.L. were married in an Islamic ceremony, and were subsequently married on November 11, 2003 in civil ceremony.

20. D.L. had three minor children from a prior marriage for which she continued to have physical custody during her marriage to Mohamed Khalil.

21. On April 19, 2004, the child A.R.K. was born to Mohamed Khalil, as the biological father, and D.L., as the biological mother.

22. A.R.K. resided in an apartment in Paterson, New Jersey with D.L.

23. Mohamed Khalil did not reside in this apartment at all times relevant to this Complaint, but instead resided outside the home, in and near Paterson, depending on where his work as an artist and circumstances took him.

24. Mohamed Khalil did not reside in the apartment of D.L. because they had determined early in their marriage that the marriage was not working, and that they should separate.

25. Mohamed Khalil is a loving father, who has always cared for his child, A.R.K.

26. Mohamed Khalil was very much involved in the loving parenting of his child prior to and during DYFS's involvement.

27. Mohamed Khalil has never harmed or neglected A.R.K.

28. On February 10, 2006, an incident took place at the residence of D.L. which resulted

in the local police being called because of an argument by and between D.L. and a neighbor within her apartment complex.

29. Mohamed Khalil, D.L. and A.R.K. were at the complex at this time.

30. The reason for the police call was not due to anything that Mohamed Khalil had done.

31. The incident led to the arrest of Mohamed Khalil, based on a false allegation of domestic violence.

32. The charges of domestic violence were later dismissed, with no finding of wrongdoing by Mohamed Khalil.

33. DYFS used this incident as a false justification for interfering with Mohamed Khalil's parental rights.

34. On or about February 15, 2006, DYFS removed A.R.K. from the home of D.L. and asserted emergency guardianship over A.R.K.

35. DYFS's documentation of the emergency removal noted, by his absence on a list of those who resided with D.L., that Mohamed Khalil did not live with D.L. at the moment of emergent removal.

36. DYFS immediately placed restrictions on Mohamed Khalil's visitation with his son.

37. On April 18, 2006, DYFS placed A.R.K. in a foster home with J.F. (foster mother) and B.F. (foster father), where A.R.K. resides to this day.

38. Mohamed Khalil successfully completed every program that the Court required he complete in order to be reunified with A.R.K. and have his parental rights fully restored.

39. Mohamed Khalil successfully completed the "Challenge Program's" twenty-six week course on anger management, and even voluntarily repeated some courses that the

Challenge Program offers.

40. Mohamed Khalil successfully completed individual counseling sessions.

41. Mohamed Khalil successfully completed the "Positive Parenting" course.

42. Mohamed Khalil successfully completed psychological counseling through Amani Shahin, a therapist at Barnert Hospital.

43. Mr. Khalil was never provided the opportunity to have his case reviewed by an independent Child Placement Review Board, which is required by New Jersey Law.

44. Despite Mohamed Khalil's successful completion of every requirement placed in front of him by DYFS, DYFS sought termination of his parental rights.

45. Those rights were terminated on October 30, 2008.

46. It was the actions of the Defendants, in violation of Mohamed Khalil's civil rights, that resulted in the termination of his parental rights.

47. Livengood falsely alleged that a stepson of Mohamed Khalil committed suicide while in Mohamed Khalil's custody and care, even though this was false.

48. Livengood minimized the serious groin injury suffered by A.R.K. in the foster parents' care, by stating that A.R.K. was medically examined two-weeks later (with even a blood test for Lyme disease), and falsely accusing Mr. Khalil of making up the groin injury, when in fact a DYFS worker had told Mohamed Khalil that the injury had occurred in a fall off of a chair. These false assertions resulted in the permanent end of Mr. Khalil's visitation with his son.

49. Livengood demonstrated abuse of process by ordering two (2) Human Services Officers to be present at a supervised visit at the home of Mohamed Khalil that was being supervised by (2) DYFS workers, resulting in a duplication of services without

cause—since it was J.F. who had abused A.R.K.

50. Livengood stated in the Appellate Division oral argument that Mr. Khalil never harmed or neglected his child, and even admitted that there was no solid evidence that the alleged domestic violence which led to DYFS's involvement in the case, ever occurred.  Despite this knowledge, Livengood proceeded with the termination of Mr. Khalil's parental rights.

51. When Dr. Nadelman evaluated Mohamed Khalil, she refused to accept any documentation from Mr. Khalil which he offered to prove that the allegations against him were false, and that he was a fit parent.

52. Dr. Nadelman, as is set forth in the New Jersey Superior Court Appellate Division Decision, stated that the  "'primary unresolved issue' was whether D.L. and M.M.K were actually separated and pursuing their own lives,' or whether this is a fabrication so that [D.L.] can obtain custody of their son.'"

53. According to Nadelman, as set forth in the Appellate Court's Opinion, "D.L. 'stated adamantly and repeatedly to DYFS, her therapists and [herself], that she and M.M.K are separated, will be divorced and will not raise [Ahmad] together.' Nadelman further reported, however, that M.M.K told her 'he would separate from his wife if necessary to regain custody of his son, but that he did not really want to do so.'"

54. In fact, Mohamed Khalil never made such a statement to Dr. Nadelman or anyone else.

55. In fact, Mohamed Khalil and D.L. were already separated at the time of DYFS's initial interference with the parental rights of Mohamed Khalil towards his son.

56. When the Chief of Police of the City of Paterson, James Wittig (now retired) offered

to testify at trial for Mohamed Khalil, Dr. Nadelman called the Police Chief in an attempt to dissuade him from testifying, telling him, "why do you want to bother, don't get involved with this guy". The Chief of Police offered to testify on Mr. Khalil's behalf despite Dr. Nadelman's phone call.

57. Even though Mohamed Khalil was a loving and caring father for his son, DYFS refused to consent to his reunification with his son because of false allegations that he might harm his son at some unspecified future time.

58. At the same time, DYFS and the Law Guardian, permitted, and upon information continue to permit, abuse of A.R.K. by the foster parents selected by DYFS.

59. For example, the foster parent J.F. admitted in Court that she physically abused A.R.K. by hitting him.

60. The explanation of the foster parent for her improper conduct was that she had neglected to take her required prescribed medication for a mental health disorder, and had lost control of herself and struck A.R.K. with a brush.

61. DYFS refused to assert that J.F. had abused or neglected A.R.K., even though J.F. openly admitted that she had in fact done so.

62. This pattern and practice of unconstitutionally interfering with the parental rights of Mohamed Khalil, while at the same time failing to protect A.R.K. from abuse from the foster parents, occurred as a result of the conduct of the Defendants in this case.

63. Kevin Belli, a Caseworker of DYFS who was charged with supervising parental visits with A.R.K., falsely stated that Mohamed Khalil had threatened him and his son.

64. In fact, Mr. Khalil had told Mr. Belli that he had admired his concern for his own child when he indicated that he was concerned about catching a cold that could be

transmitted to his son if he presided over a visit while A.R.K. was sick.

65. This false allegation resulted in lost parenting time by Mr. Khalil with his son, from three hours a week in his own apartment, to one hour at a DYFS office.

66. Subsequent to the reduced parenting time, Kevin Belli actually improperly came to the room and stood in the doorway of the room where Mohamed was visiting his son at DYFS, and laughed at his situation.

67. During one supervised visiting session, a DYFS caseworker and supervisor refused to let Mohamed Khalil call his mother in Egypt (A.R.K.'s paternal grandmother) at A.R.K.'s request, on his cell phone.

68. A.R.K. had bonded with his grandmother through previous phone calls, and did not understand why he could no longer talk to his grandmother.

69. A.R.K.'s paternal grandmother died on November 21, 2012, and A.R.K. never will have another opportunity to talk to her.

70. Family Intervention Services, Inc., at the direction of DYFS, supervised a number of visits by Mohamed Khalil with A.R.K. at its facility located in Paterson, New Jersey.

71. The conditions in its facility for visitation were unsafe.  The visits were conducted in a dusty basement storage room, cluttered with old computers, file cabinets, boxes of files, and with exposed electrical wires on the floors.

72. FIS caused Mohamed Khalil to share a visit with his son with D.L., despite the fact that it was DYFS's position that there should be no contact between D.L. and Mr. Khalil—contact which was an alleged basis for DYFS's Termination of Parental Rights Complaint.

73. FIS subjected A.R.K. to harm by transporting A.R.K. to supervised visits with no car

seat, no booster seat, and no working seat belt.

74. When the FIS aide was asked why there was no proper car seat for A.R.K., he responded that he was not aware that one was required.

75. FIS subjected A.R.K. to harm by allowing the transport aide to talk on a cell phone while driving the vehicle A.R.K. was being transported in and by allowing the transport aide to drive while A.R.K. was standing in the van, instead of being secured in a seat.

76. Gillian Batts, a Caseworker of DYFS who, upon information and belief is assigned to cases where DYFS's plan for permanency is adoption, was assigned to Mohamed Khalil's case prior to the termination of his parental rights.

77. The fact that Gillian Batts began the process of adoption, prior to the conclusion of Mohamed Khalil's termination of parental rights, demonstrates DYFS's malicious intent in proceeding with the termination of Mohamed Khalil's parental rights in violation of his civil rights of due process.

78. For example, Batts required Mohamed to fill out forms for the child adoption process prior to the judgment terminating his rights.

79. Batts refused to tell Mohamed Khalil, for whom English is a second language, what the forms were for.  It was only at the investigation of Mr. Khalil that he learned what was the forms' purpose.

80. Mohamed Khalil called the local police on five separate occasions because A.R.K. showed up at visits supervised by Batts, Vargas and other caseworkers, with black eyes, bruises, swelling of both legs, and marks around his neck.

81. In addition, Mohamed Khalil called the local police on occasions to report DYFS

workers humiliating Mohamed in front of A.R.K. during visits and attempting to physically engage him.

82. On one occasion, while DYFS caseworker Batts was involved in the case, St. Joseph's Hospital, in Paterson, New Jersey, determined from A.R.K. physical condition that there was in fact child abuse.

83. New Jersey's Institutional Abuse Investigation Unit, a division under the Department of Children and Families, failed to do a proper follow-up investigation, and based a finding of no abuse on medical examinations performed approximately two weeks after the abuse, when the physical abuse could no longer be physically verified.

84. Batts saw the subject bruises, but failed to testify to the obvious physical abuse in Court and fabricated to the Court that the bruises were caused by falls at the foster parents' home, which never occurred.

85. While A.R.K. was removed from the foster parents for one-and-a-half months pending the completion of an investigation of abuse regarding the foster parents, Batts covered for the fact that A.R.K. was progressing better outside the foster family by fabricating an assertion that A.R.K. believed he was on vacation and would return to the foster family.

86. On April 25, 2008, DYFS was ordered to turn over all medical records and dental records for A.R.K. to Mr. Khalil, but DYFS failed to do so, in violation of the Court's order.

87. Janet Dasilva, a supervisor for Batts, cancelled supervised visits of Mr. Khalil with his child, with no justification. On one occasion, D.L. was scheduled a make-up visit and DYFS caused Mohamed Khalil to share his visit with his son with D.L., despite

the fact that it was DYFS's position that there should be no contact between D.L. and Mr. Khalil—contact which was an alleged basis for DYFS's Termination of Parental Rights Complaint.

88. While he was pursuing his due process rights to keep his parental rights, Mohamed Khalil expressed his concern to Dasilva about the fact that the foster parents were bringing A.R.K. to Christian religious service, when Mohamed Khalil and A.R.K. were Muslim.

89. Despite the fact that Mohamed Khalil was still vehemently defending his parental rights and had not yet exhausted his due process rights, Dasilva asserted that Mr. Khalil had no justification for concern, because A.R.K. was going to be adopted and was going to be raised as a Christian, while adamantly banging her hand on her desk several times and shouting, "So What"!

90. The Law Guardian of A.R.K., Arlene Cohn, complained that Mohamed Khalil's limited visitations with his son were interfering with the foster parent's parenting time, against the best interests of A.R.K. and the parental rights of Mohamed Khalil.

91. These complaints resulted in less parental visits with A.R.K. by Mohamed Khalil.

92. Arlene Cohn falsely alleged that Mohamed Khalil had threatened A.R.K.'s school principal and tried to contact the foster parents, when in fact no such threat occurred and no such contact was made.

93. Arlene Cohn covered up the physical abuse that A.R.K. was receiving at the hands of the foster parents, by falsely claiming that the bruises were the result of playground incidents at school and home, without any evidence to support this claim. She further improperly influenced the Court by mischaracterizing that there were marks instead

of bruises, and taps instead of hitting.

94. In one incident, where the DYFS transportation aide reported to Mohamed Khalil when A.R.K. was crying in pain and unable to walk that A.R.K. allegedly suffered a serious groin injury at school, Arlene Cohn failed to ensure that A.R.K. received timely medical treatment, and he suffered as a result.  In another incident there was a cut on his face, which was never treated and resulted in a permanent scar.  In a third incident, A.R.K. suffered the loss of his four front teeth in one day, and the recommendations of the dentist to  treat  A.R.K. to assure that the permanent teeth would grow in correctly were not followed—causing him to suffer psychologically and physically from being unable to chew properly.

95. Arlene Cohn also failed to ensure that A.R.K. was raised in his Muslim religious faith, and in fact asserted that she did not care about the religious upbringing of A.R.K.

96. DYFS failed to properly search for a Muslim family to place A.R.K. with as a foster family, and when Muslim organizations or families were presented, they were ignored and told that Abdul was returned to his family.

97. DYFS failed to place A.R.K. with Mohamed Khalil's brother and sister-in-law, as a familial alternative to an unrelated foster family, even though they completed the DYFS requirements for A.R.K.'s transfer to California in December of 2006.

98. Doctor Rachel Jewelwicz-Nelson improperly administered psychological testing on Mohamed Khalil which was not appropriate considering that English is his second language, that she had never evaluated someone with a Middle Eastern/Muslim cultural background, which negatively affected the results and which were in

violation of the New Jersey Board of Psychological Examiners and the American Psychological Association's guidelines and requirements.

99. In fact, Dr. Nelson complained that Mr. Khalil asked too many questions during the analytical sessions.

100.    Dr. Nelson improperly found that Mr. Khalil was narcistic, simply because he was proud of his art.

101.    Mohamed Khalil is an artist by profession, and his pride in his art is not part of a narcistic disorder.  Despite her diagnosis in 2008, within a few days Mr. Khalil was in fact appointed by his Congressman to represent his district and create a Christmas Ornament for the White House Christmas Tree.  His Christmas Tree Ornament hung from the Christmas Tree that very Christmas, in the blue room inside the White House.  He was invited to the White House, and met the First Lady.

102.    DYFS, however, never provided psychological treatment services for any alleged disorder.

103.    Dr. Nelson also misrepresented the nature of how Mr. Khalil played with his son.

104.    When Dr. Nelson administered testing for the foster mother, great assistance was provided to the foster mother by Dr. Nelson which improperly affected the results in favor of adoption.  Dr. Nelson never tested the foster father.

105.    Dr. Nelson also minimized the findings of the Audrey Hepburn Children's House, the State Appointed Northern Regional Diagnostic Center for Child Abuse, that the foster parents were not fit to parent A.R.K.—including but not limited to concerns about the conditions of the home and the psychological fitness of the foster mother.

106.    Dr. Nelson's 2nd evaluation of the foster mother, after evidence that the foster

mother had abused A.R.K. had been discovered, was a clear conflict of interest, because Dr. Nelson had already recommended Termination of Parental Rights with foster home adoption.

107.   On November 23, 2010, Plaintiffs encountered Ezeadi Kelechi, and a DYFS supervisor, at a crowded public restaurant in Paterson, New Jersey.

108.   At the restaurant, Kelechi harassed and threatened the Plaintiffs, yelling in full public earshot, *inter alia*, that "I am DYFS; he [Mohamed Khalil] is a terrorist.  We [DYFS] have his son. Ha Ha.  How much did you pay your lawyer, $80 Grand?  And you still don't have your son.  Because you never will. Because we [DYFS] will never give him back."

109.   Kelechi's verbal assault on Plaintiffs didn't end there, but continued, "Muslim Terrorist, Bin Laden Lover.  He's [Mohamed Khalil] a terrorist.  Do you have bomb belt strapped on?  Why don't you call your Allah La La La?  You have your knife in your pocket?  Are you gonna slit my throat?"

110.   Kelechi also exclaimed, "Go back to your Country.  You people ruined my country".

111.   When Plaintiff, Sandra Damrah told Kelechi that she was born in the United States, Kelechi laughed, "You don't look like it".

112.   Kelechi further threatened Plaintiffs with filing baseless complaints against the Plaintiffs, by using DYFS caseworkers in Kelechi's office against the Plaintiffs.

113.   Local police arrived at the scene, in response to Plaintiff Sandra Damrah's 911 call, to investigate the public disturbance caused by Kelechi, and Kelechi (who was wearing a government badge) announced to the police and the public at the restaurant

that, "I am a government employee".

114.   At the time of the incident Kelechi was not involved in Mohamed Khalil's case, having only been involved to evaluate the family in 2003, prior to A.R.K. being born.

115.   Yet, Kelechi knew confidential information about Mr. Khalil's case, including the exact amount which he had paid for his legal fees and the status of his case.

116.   By yelling in public, Kelechi publically defamed, harassed, verbally assaulted and terrorized the Plaintiffs. In addition, he violated Mohamed Khalil's rights by releasing confidential information about the parental termination proceedings which are to remain confidential by law.

117.   In terminating Mohamed Khalil's parental rights, Defendants have committed fraud upon the Court.

118.   In fact, Mohamed Khalil has never abused or neglected A.R.K.

119.   Defendants have continued the conspiracy to deny Mohamed Khalil fundamental rights as a parent through retaliation, because Mohamed Khalil continues to fight for his parental rights.

120.   Defendants' actions are unacceptable, malicious and a clear violation of Plaintiff's Civil Rights.

121.   Because this Complaint alleges continuing conspiratorial violations of the Plaintiff's Civil Rights which are continuing to accrue, the Complaint has been brought within the Statute of Limitations for Federal Civil Rights Actions.

122.   DYFS's continued obstruction of Mohamed Khalil's parental rights serves no legitimate purpose and is being done solely to harass and retaliate against Plaintiff for asserting his Civil Rights.

123.   Upon information and belief, DYFS has on prior occasions handled child abuse and neglect complaints in a manner that was violative of citizen's rights.

124.   Upon information and belief, DYFS has on prior occasions misrepresented factual allegations and anonymous reporting in order to violate citizen's rights.

125.   Upon information and belief, DYFS has on prior occasions knowingly misrepresented hearsay allegations in order to violate citizen's rights.

## FIRST CLAIM FOR RELIEF

## 42 U.S.C.A. §1983 - VIOLATION OF FOURTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS BY DEFENDANTS, THE DIVISION OF CHILD PROTECTION AND PERMANENCY, KARA P. WOOD AND ALLISON BLAKE

126.   Plaintiff Mohamed Khalil incorporates by reference the allegations contained in the above paragraphs, as though fully set forth here.

127.   The Defendants, The Division of Child Protection and Permanency (formerly the Division of Youth and Family Services, "DYFS"), Kara P. Wood and Allison Blake are charged with the responsibility and duty to protect and serve the public by properly hiring, supervising, training, disciplining and controlling child protective service workers under their command.

128.   This responsibility includes promulgation and enforcement of rules and regulations regarding avoidance of threats and abuse of process in the investigation of allegations of child abuse.

129.   On information and belief, Defendants DYFS, Kara P. Wood and Allison Blake, failed to promulgate adequate rules and regulations regarding avoidance of threats

and abuse of process in the investigation of allegations of child abuse and further failed to instruct, discipline and train in the appropriate methods for handling and investigating allegations of child abuse without resorting to threats and abuse of process.

130.    On information and belief, Defendants DYFS, Kara P. Wood and Allison Blake, established through tacit authorization or explicit instruction a policy or custom of allowing DYFS workers to commit abuse of process. That policy was enacted and enforced with deliberate indifference to the constitutional rights of Plaintiff.

131.    Plaintiff has been harmed by such policy.

132.    Such policy is violative of Plaintiff's due process rights under the Fourth Amendment, which states in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law . . ." and the Fourteenth Amendment, which states in pertinent part that no State may "deprive any person of life, liberty, or property, without due process of law . . .", to the Constitution of the United States of America.

133.    This development, implementation, and carrying out of a policy, practice, procedure, or custom amounts to cruel and unusual punishment and a deprivation of life and liberty under 42 U.S.C. Section 1983.

**WHEREFORE**, Plaintiff, Mohamed Khalil, respectfully demands judgment against the Defendants, The Division of Child Protection and Permanency, Kara P. Wood and Allison Blake, jointly and severally:

A)  For Injunctive Relief in the form of an order requiring that the explicit instruction and policy be made requiring DYFS workers to refrain from abuse of process.

## SECOND CLAIM FOR RELIEF

## 42 U.S.C.A. §1983 & §1986  - VIOLATION OF SIXTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS

134.    Plaintiff Mohamed Khalil incorporates by reference the allegations contained in the above paragraphs, as though fully set forth here.

135.    On information and belief, Defendants, The Division of Child Protection and Permanency, Kara P. Wood and Allison Blake failed to properly hire, supervise, train, discipline, and control DYFS workers under their command, including DYFS Defendants, and failed to insure compliance with the laws, rules, and regulations regarding the use and abuse of process in child abuse investigations; that failure has resulted in a policy or custom of inadequate training, supervision, and/or discipline.

136.    On information and belief, Defendants The Division of Child Protection and Permanency, Kara P. Wood and Allison Blake's custom of failing to properly hire, supervise, train, discipline, and control child protective services workers under their command, including Defendants and their failure to insure compliance with the laws, rules, and regulations prohibiting the abuse of process amounts to deliberate indifference to the rights of persons with whom the child protective services workers come into contact, including the rights of Plaintiff in this case.

137.    Defendants Kara P. Wood and Allison Blake's custom and policy of allowing abuse of process and their failure to properly hire, supervise, train, discipline, and control child protective services workers under their command, including DYFS Defendants, was so reckless or grossly negligent that misconduct involving the abuse

of process was inevitable.

138.    By virtue of this policy and conduct, Plaintiff's rights under the Sixth Amendment, which states in pertinent part that persons "shall enjoy the right to a speedy and public trial . . .  and to have the Assistance of Counsel for his defence", and Fourteenth Amendment,  which states in pertinent part that no State may "deprive any person of life, liberty, or property, without due process of law . . .", to the Constitution of the United States of America and 42 U.S.C. Section 1983 have been violated.

139.    Defendants' neglect, aid and refusal to prevent and/or rectify infringement of the constitutional rights of Plaintiff constitute a violation of the Civil Rights Act, Section 1986.

**WHEREFORE**, Plaintiff, Mohamed Khalil, respectfully demands judgment against the Defendants, The Division of Child Protection and Permanency, Kara P. Wood and Allison Blake, jointly and severally:

A) For Injunctive Relief in the form of an order requiring that the explicit instruction and policy be made requiring DYFS workers to refrain from abuse of process.

### THIRD CLAIM FOR RELIEF

### 42  U.S.C.A. § 1985 - CONSPIRACY TO VIOLATE CIVIL RIGHTS

140.    Plaintiff incorporates by reference the allegations contained in paragraphs above, as though fully set forth here.

141.   Defendants reached a meeting of the minds amongst themselves that incidents of abuse of process would be tolerated notwithstanding the constitutional implications of such abuse and the likelihood such conduct would be repeated.

142.   On information and belief, this meeting of the minds can be proven through Defendants incidents of abuse of process and from the repeating of that conduct in an effort to deny Mohamed Khalil his rights of due process.

143.   These conspiracies constituted and continue to constitute ongoing violations of 42 *U.S.C.* Section 1985.

**WHEREFORE**, Plaintiff, Mohamed Khalil, respectfully demands judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15, jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal and state law and for:

A)  Damages in the amount of $10,000,000.00; and

B)  Punitive Damages in the amount of $50,000,000.00; and

C)   Awarding counsel fees to Plaintiff's legal counsel; and

D)  Awarding Costs of Suit; and

E)  Interest; and

F)  Damages for Pain and Suffering; and

G) For such other relief as the Court may determine to be appropriate.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C.A. §1983 - VIOLATION OF DUE PROCESS AND EQUAL PROTECTION RIGHTS BY DEFENDANTS**

144.    Plaintiff Mohamed Khalil incorporates by reference the allegations contained in paragraphs above as though fully set forth here.

145.    The acts and/or omission of Defendants The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood and John Does 1-15 in this case were performed under color of law and deprived Plaintiff of his Fifth ("nor be deprived of life, liberty, or property, without due process of law"), Sixth (""shall enjoy the right to a speedy and public trial . . .  and to have the Assistance of Counsel for his defence"), Eighth (no "cruel and unusual punishments inflicted"), and Fourteenth Amendment ("deprive any person of life, liberty, or property, without due process of law . . ." and "no state shall ... deny to any person within its jurisdiction the equal protection of the laws") rights under the United States Constitution to due process, compulsory process, equal protection, and freedom from interference with his fundamental rights as a parent without due process of law.

146.    By virtue of this policy and conduct, Plaintiff's rights under the Sixth Amendment, and Fourteenth Amendment to the Constitution of the United States of America, have been violated.

147.   Defendants' acts and omissions furthermore interfered with Plaintiff's fundamental rights to privacy and freedom from excessive interference with raising a family.

148.   Defendants' acts and/or omissions were a moving force behind an objectively unreasonable abuse of process against Plaintiff resulting in the above-referenced constitutional violations.

149.   The acts and/or omission of defendants in this case were performed under color of law and deprived Plaintiff of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution to due process, equal protection.

150.   This development, implementation, and carrying out of a policy, practice, procedure, or custom amounts to cruel and unusual punishment and a deprivation of life and liberty under 42 U.S.C. Section 1983.

**WHEREFORE**, Plaintiff, Mohamed Khalil, respectfully demands judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15, jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal and state law and for:

A)  Damages in the amount of $10,000,000.00; and

B)  Punitive Damages in the amount of $50,000,000.00; and

C)   Awarding counsel fees to Plaintiff's legal counsel; and

D)  Awarding Costs of Suit; and

E)  Interest; and

F)  Damages for Pain and Suffering; and

G) For such other relief as the Court may determine to be appropriate.

### FIFTH CLAIM FOR RELIEF 42 U.S.C.A. §1983

### VIOLATION OF FIRST, FOURTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY DEFENDANTS

151.    Plaintiff Mohamed Khalil incorporates by reference the allegations contained in paragraphs above, as though fully set forth here.

152.    Any and all acts and omissions of Defendants The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood and John Does 1-15, alleged in this complaint constitute actions or omissions under the color and pretense of the laws, statutes, ordinances, regulations, customs, and usage of DYFS.

153.    Defendants owed a duty to protect and serve the public, including Plaintiff and those similarly situated.

154.    Under the circumstances as they existed in this case these Defendants had a duty to not commit abuses of process.

155.    Defendants were acting under color of state law, instituted and followed policies, procedures in a manner that directly resulted in the objectively unreasonable abuse of process against Plaintiff resulting in injury.

156.    Defendants in acting under color of state law, acted with deliberate and

unreasonable conduct in violation of clearly established law of which a reasonable child protective services worker should have known.

157.     In these above-stated actions, Defendants caused Plaintiff to be deprived of rights, privileges, and immunities, as those rights are secured under the First ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."), Fourth (no person shall "be deprived of life, liberty, or property, without due process of law . . ." ), Sixth (""shall enjoy the right to a speedy and public trial . . .  and to have the Assistance of Counsel for his defence"), Eighth (no "cruel and unusual punishments inflicted"), Eighth (no "cruel and unusual punishments inflicted"), and Fourteenth Amendment ("deprive any person of life, liberty, or property, without due process of law . . ." and "no state shall ... deny to any person within its jurisdiction the equal protection of the laws") Amendments to the United States Constitution.

158.     In these above-stated actions, Defendants caused Plaintiff to be deprived of his rights, privileges, and immunities to be free from excessive interference with family relationships and to due process, as those rights are secured under the Fourth and Fourteenth Amendments to the United States Constitution.

159.     Defendants also caused Plaintiff to be deprived of his rights to speak truthfully about the Defendants' conduct without fear of reprisal and retaliation in violation of the First Amendment to the United States Constitution.

160.     As a direct and proximate result of the acts and omissions described in this

complaint, Defendants are liable in damages to Mohamed Khalil for deprivation of his rights under 42 U.S.C.A. §1983.

**WHEREFORE**, Plaintiff, Mohamed Khalil, respectfully demands judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15, jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal and state law and for:

A) Damages in the amount of $10,000,000.00; and

B) Punitive Damages in the amount of $50,000,000.00; and

C)  Awarding counsel fees to Plaintiff's legal counsel; and

D) Awarding Costs of Suit; and

E) Interest; and

F) Damages for Pain and Suffering; and

G) For such other relief as the Court may determine to be appropriate.


### SIXTH CLAIM FOR RELIEF

### 42 U.S.C.A. §1983 - RETALIATION FOR PROTECTED ACTIVITY

161.    Plaintiffs Mohamed Khalil and Sandra Damrah incorporate by reference the allegations contained in above paragraphs, above, as though fully set forth here.

162.    Plaintiff Mohamed Khalil has pursued avenues of appeal and exercise of free speech to preserve his parental rights and made complaints about DYFS's conduct in

this case.   Plaintiff Sandra Damrah has assisted Mr. Khalil in his pursuit of due process.

163.   This activity by Plaintiffs is protected by the United States Constitution, specifically, the First Amendment, which states in pertinent part that "Congress shall make no law . . .   abridging the freedom of speech . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances" and Fourteenth Amendment to the Constitution, which states in pertinent part that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws."

164.   Defendants' conduct was done solely in retaliation for Plaintiff Mohamed Khalil's exercise of his rights of due process and Plaintiffs' exercise of their First Amendment rights in communicating seeking investigation of Defendants' actions.

165.   The above-described acts done by Defendants were in excess of any authority granted them by law, and were without justification or excuse in law.

166.   These acts are a blatant effort to punish Plaintiffs for seeking due process relief against the events at issue in this case and for seeking recovery for his damages, and to intimidate him in his litigation of his rights.

167.   Defendants acted willfully, knowingly, and purposely, with the specific intent of depriving Plaintiffs of their rights.

168.   The acts of Defendants did in fact deny Plaintiffs their rights as those rights are secured to Plaintiff in the First and Fourteenth Amendments to the United States Constitution and in 42 U.S.C.A. §1983.

169.   As a result of the actions of Defendants in retaliating against Plaintiffs in

opposition to Defendants' unlawful practices, Plaintiffs have been damaged and have incurred great emotional distress, mental anguish, undue hardship, humiliation, inconvenience, and loss of enjoyment of life.

170.    As a further direct and proximate result of the above-described unlawful conduct of Defendants, Plaintiffs will be required to expend money for legal costs and to secure recovery for damages incurred, in an amount not yet ascertained.

**WHEREFORE**, Plaintiffs, Mohamed Khalil and Sandra Damrah, respectfully demand judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15, jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiffs in light of the caps on certain damages set forth in applicable federal and state law and for:

A)  Damages in the amount of $10,000,000.00; and

B)  Punitive Damages in the amount of $50,000,000.00; and

C)   Awarding counsel fees to Plaintiff's legal counsel; and

D)  Awarding Costs of Suit; and

E)  Interest; and

F)  Damages for Pain and Suffering; and

G) For such other relief as the Court may determine to be appropriate.

## SEVENTH CLAIM FOR RELIEF
## INFLICTION OF EMOTIONAL DISTRESS

171.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

172.    Defendants acted in conspiracy with the Defendant Ezeadi Kelechi.

173.    The aforesaid extreme and outrageous conduct, acts, and/or omissions of the Defendants both individually and/or in the scope of the employment, or acting independently, were calculated, designed, and intended by the Defendants to intentionally inflict deliberate emotional distress, psychological trauma, and psychic pain and suffering upon said Plaintiffs and to instill in their minds an immediate and permanent sense of fear and trepidation, and said conduct, acts or omissions surpass all bounds of decency universally recognized in a civilized society.

174.    As a direct and proximate result and consequence of the aforesaid conduct, acts, and/or omissions of the Defendants, which constitute extremely outrageous conduct, said Plaintiffs have suffered, are suffering, and/or will continue to suffer for an indefinite time in the future the following:

a)       Emotional and psychological distress and trauma; and

b)       Mental anguish; and

c)       Psychic pain and suffering; and

d)       Severe fright, horror, and grief; and

e)       Shame, humiliation, and embarrassment; and

f)       Severe anger, chagrin, disappointment, and worry; and

g) Justified punitive damages, both factually and legally, because of the outlandish and outrageous conduct, actions, and/or omissions of one or more of the Defendants.

**WHEREFORE**, Plaintiffs, Mohamed Khalil and Sandra Damrah, respectfully demand judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15, jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiffs in light of the caps on certain damages set forth in applicable federal and state law and for:

A) Damages in the amount of $10,000,000.00; and

B) Punitive Damages in the amount of $50,000,000.00; and

C) Awarding counsel fees to Plaintiff's legal counsel; and

D) Awarding Costs of Suit; and

E) Interest; and

F) Damages for Pain and Suffering; and

G) For such other relief as the Court may determine to be appropriate.

## EIGHTH CLAIM FOR RELIEF
## INVASION OF PRIVACY
### (False Light)

175.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

176.    The Defendants acted in conspiracy with Ezeadi Kelechi.

177.    The false light which the Defendant Ezeadi Kelechi placed the Plaintiffs in would be highly offensive to a reasonable person.

178.    The Defendants, in conspiracy with Ezeadi Kelechi, knew and/or acted in reckless disregard as to the falsity of the publicized matters and the false light in which the Plaintiffs were placed.

179.    The aforesaid extreme and outrageous conduct, acts, and/or omissions of the Defendants both individually and/or in the scope of the employment, or acting independently, were calculated, designed, and intended by the Defendants to intentionally inflict deliberate emotional distress, psychological trauma, and psychic pain and suffering upon said Plaintiffs and to instill in their minds an immediate and permanent sense of fear and trepidation, and said conduct, acts or omissions surpass all bounds of decency universally recognized in a civilized society.

180.    As a direct and proximate result and consequence of the aforesaid conduct, acts, and/or omissions of the Defendants, which constitute extremely outrageous conduct, said Plaintiffs have suffered, are suffering, and/or will continue to suffer for an indefinite time in the future the following:

      a)      Emotional and psychological distress and trauma; and

      b)      Mental anguish; and

    c)      Psychic pain and suffering; and

    d)      Severe fright, horror, and grief; and

    e)      Shame, humiliation, and embarrassment; and

    f)      Severe anger, chagrin, disappointment, and worry; and

    g)      Justified punitive damages, both factually and legally, because of the outlandish and outrageous conduct, actions, and/or omissions of one or more of the Defendants.

**WHEREFORE**, Plaintiffs, Mohamed Khalil and  Sandra Damrah, respectfully demand judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15 jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiffs in light of the caps on certain damages set forth in applicable federal and state law and for:

    A)  Damages in the amount of $10,000,000.00; and

    B)  Punitive Damages in the amount of $50,000,000.00; and

    C)   Awarding counsel fees to Plaintiff's legal counsel; and

    D)  Awarding Costs of Suit; and

    E)  Interest; and

    F)  Damages for Pain and Suffering; and

    G)  For such other relief as the Court may determine to be appropriate.

## NINTH CLAIM FOR RELIEF
## INVASION OF PRIVACY
### (Intrusion of Seclusion)

181.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

182.    The Defendants acted in conspiracy with Ezeadi Kelechi.

183.    Kelechi intentionally intruded, physically and/or otherwise, upon the solitude and/or seclusion of the Plaintiffs and their affairs or concerns.

184.    The intrusion would be highly offensive to a reasonable person.

185.    The aforesaid extreme and outrageous conduct, acts, and/or omissions of the Defendants both individually and/or in the scope of the employment, or acting independently, were calculated, designed, and intended by the Defendants to intentionally inflict deliberate emotional distress, psychological trauma, and psychic pain and suffering upon said Plaintiffs and to instill in their minds an immediate and permanent sense of fear and trepidation, and said conduct, acts or omissions surpass all bounds of decency universally recognized in a civilized society.

186.    As a direct and proximate result and consequence of the aforesaid conduct, acts, and/or omissions of the Defendants, which constitute extremely outrageous conduct, said Plaintiffs have suffered, are suffering, and/or will continue to suffer for an indefinite time in the future the following:

      a)      Emotional and psychological distress and trauma; and

      b)      Mental anguish; and

      c)      Psychic pain and suffering; and

d)      Severe fright, horror, and grief; and

e)      Shame, humiliation, and embarrassment; and

f)       Severe anger, chagrin, disappointment, and worry; and

g)      Justified punitive damages, both factually and legally, because of the outlandish and outrageous conduct, actions, and/or omissions of one or more of the Defendants.

**WHEREFORE**, Plaintiffs, Mohamed Khalil and Sandra Damrah, respectfully demand judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15 jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiffs in light of the caps on certain damages set forth in applicable federal and state law and for:

A)  Damages in the amount of $10,000,000.00; and

B)  Punitive Damages in the amount of $50,000,000.00; and

C)   Awarding counsel fees to Plaintiff's legal counsel; and

D)  Awarding Costs of Suit; and

E)  Interest; and

F)  Damages for Pain and Suffering; and

G)  For such other relief as the Court may determine to be appropriate.

## TENTH CLAIM FOR RELIEF
## ASSAULT

187.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

188.    The Defendants acted in conspiracy with Ezeadi Kelechi.

189.    Kelechi acted intending to cause harmful or offensive contact with the Plaintiffs, or intending to place the Plaintiffs in imminent apprehension of such contact.

190.    The Plaintiffs, in fact, were put in such imminent apprehensions by the conduct of Kelechi.

191.    The aforesaid extreme and outrageous conduct, acts, and/or omissions of the Defendants both individually and/or in the scope of the employment, or acting independently, were calculated, designed, and intended by the Defendants to intentionally inflict deliberate emotional distress, psychological trauma, and psychic pain and suffering upon said Plaintiffs and to instill in their minds an immediate and permanent sense of fear and trepidation, and said conduct, acts or omissions surpass all bounds of decency universally recognized in a civilized society.

192.    As a direct and proximate result and consequence of the aforesaid conduct, acts, and/or omissions of the Defendants, which constitute extremely outrageous conduct, said Plaintiffs have suffered, are suffering, and/or will continue to suffer for an indefinite time in the future the following:

      a)      Emotional and psychological distress and trauma; and

      b)      Mental anguish; and

     c)      Psychic pain and suffering; and

     d)      Severe fright, horror, and grief; and

     e)      Shame, humiliation, and embarrassment; and

     f)      Severe anger, chagrin, disappointment, and worry; and

     g)      Justified punitive damages, both factually and legally, because of the outlandish and outrageous conduct, actions, and/or omissions of one or more of the Defendants.

**WHEREFORE**, Plaintiffs, Mohamed Khalil and  Sandra Damrah, respectfully demand judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15 jointly and severally, molded by the Court to maximize the financial recovery available to Plaintiffs in light of the caps on certain damages set forth in applicable federal and state law and for:

    A)  Damages in the amount of $10,000,000.00; and

    B)  Punitive Damages in the amount of $50,000,000.00; and

    C)   Awarding counsel fees to Plaintiff's legal counsel; and

    D)  Awarding Costs of Suit; and

    E)  Interest; and

    F)  Damages for Pain and Suffering; and

    G)  For such other relief as the Court may determine to be appropriate.

**ELEVENTH CLAIM FOR RELIEF**
**(New Jersey Civil Rights Act)**

193.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

194.    Defendants have proximately caused the Plaintiffs to suffer the deprivation of substantive due process, equal protection rights, privileges and/or immunities secured by the Constitution and/or laws of the United States, and substantive rights, privileges or immunities secured by the Constitution of the United States of America and the laws of the State of New Jersey, by their interference with the rights of the Plaintiffs.

195.    In addition to the aforementioned Civil Rights and Constitutional Rights violations, the Defendants have violated Plaintiffs' right to Freedom of Speech, Freedom from Unreasonable Search and Seizure, Freedom to Exercise Religion and Right to Privacy under the Constitution of the State of New Jersey.

196.    By virtue of the foregoing acts, defendants have violated Plaintiffs' rights under Section 10:6-2 of the New Jersey Statutes (the New Jersey  Civil Rights Act), as a result which Plaintiffs has been damaged.

**WHEREFORE**, Plaintiffs, Mohamed Khalil and  Sandra Damrah, respectfully demand judgment against the Defendants, The New Jersey Division of Child Protection and Permanency, Kara P. Wood, Allison Blake, Kevin Belli, Gillian Batts, Janet Dasilva, Esperanza Vargas, Arlene Cohn, Rachel Jewelwicz-Nelson, Ezeadi Kelechi, Alice Shaeffer Nadelman, Geraldine Livengood, Family Intervention Services, Inc. and John Does 1-15 jointly and severally, molded

by the Court to maximize the financial recovery available to Plaintiffs in light of the caps on certain damages set forth in applicable federal and state law and for:

A) Damages in the amount of $10,000,000.00; and

B) Punitive Damages in the amount of $50,000,000.00; and

C)  Awarding counsel fees to Plaintiff's legal counsel; and

D) Awarding Costs of Suit; and

E) Interest; and

F) Damages for Pain and Suffering; and

G) For such other relief as the Court may determine to be appropriate.

## DAMAGE CLAIMS AS AGAINST ALL DEFENDANTS

## PUNITIVE DAMAGES

197.    Plaintiffs incorporate by reference the allegations contained in paragraphs above, as though fully set forth here.

198.    In addition to compensatory damages, Plaintiffs hereby make a claim for punitive damages against Defendants in an amount to be proven at trial for the willful and wanton acts and omissions of Defendants, to include violation of Plaintiffs' civil rights, as alleged in this complaint.

199.    The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others, including Plaintiffs.

200.    Defendants committed the acts and omissions alleged in this complaint and

subjected Plaintiffs to improper treatment that caused Plaintiffs to suffer emotional distress so severe that no person should be expected to endure it.

201.    Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

202.    The recovery of punitive damages is permitted under the federal civil rights statutes for reckless and callous indifference to the federally protected rights of others, and is thus appropriate in this case.

203.    This instance of reckless and callous indifference to Plaintiffs' safety and constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that must not be tolerated.

## ATTORNEY'S FEES

204.    Plaintiffs incorporate by reference the allegations contained in paragraphs above, as though fully set forth here.

205.    As a result of Defendants' actions as alleged in this complaint, Plaintiffs have been required to retain the service of attorneys and are entitled to a reasonable amount for attorney's fees pursuant to 42 U.S.C.A. §1988 for those violations covered by the Civil Rights Act.

## DAMAGES

206.    Plaintiffs incorporate by reference the allegations contained in paragraphs above, as though fully set forth here.

207.   The acts and omissions of Defendants as set forth above have resulted in injury to Plaintiffs.

208.   By virtue of these injuries, Plaintiffs are entitled to the following damages from all defendants:

a)  Expenses associated with defense of Mohamed Khalil's parental rights; and

b)  Mental and emotional pain and suffering; and

c)  Humiliation and sociological distress; and

d)  For Injunctive Relief in the form of an order requiring that the explicit instruction and policy be made requiring DYFS workers to refrain from abuse of process; and

e)  Compensatory Damages in the amount of $10,000,000.00; and

f)  Punitive damages in $50,000,000 or a reasonable amount that is sufficient to adequately punish all defendants and to deter future conduct of the type alleged in this complaint; and

g)  The costs of this action, attorney's fees, and such other and further relief as this Court deems just and proper.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff demands that this matter be tried to a jury of twelve in the United States District Court for the District of New Jersey, Newark Vicinage.

Dated: November 25, 2012

KENNETH ROSELLINI, ESQ. (6047)
Attorney for Plaintiff

Dated: November 25, 2012

MOHAMED KHALIL, Plaintiff

Dated: November 25, 2012

SANDRA DAMRAH, Plaintiff

## CERTIFICATION

I hereby certify that to the best of my information, knowledge and belief that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, that no other action or arbitration is contemplated, and I am not aware of any other person whom should be joined in this matter

Dated: November 25, 2012

KENNETH ROSELLINI, ESQ. (6047)
Attorney at Law

## TRIAL COUNSEL DESIGNATION

Kenneth Rosellini, Esq. is hereby designated trial counsel in this matter.