**United States District Court
for the District Of New Jersey**

MOHAMED KHALIL, SANDRA DAMRAH

                Plaintiffs,

   v.

THE NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY
("DCP&P"), formerly known as DIVISION OF
YOUTH AND FAMILY SERVICES; KARA P.
WOOD in her official capacity as Director of
DCP&P; ALLISON BLAKE in her official
capacity as the Commissioner of the Department
of Children and Families; KEVIN BELLI in his
individual capacity; GILLIAN BATTS in her
individual capacity; JANET DASILVA
in her individual capacity; ESPERANZA
VARGAS in her individual capacity; ARLENE
COHN in her individual capacity; EZEADI
KELECHI in his individual capacity; ALICE
SCHAEFFER NADELMAN
in her individual capacity; GERALDINE
LIVENGOOD in her individual capacity;
FAMILY INTERVENTION SERVICES, INC.;
JOHN DOES 1-15

                Defendants.

Civil No.: 12-7284 (KSH)

<u>Opinion</u>

**<u>Katharine S. Hayden, U.S.D.J.</u>**

      Plaintiff Mohamed Khalil has filed a civil-rights suit in which he alleges that the New

Jersey state proceedings that led to the October 2008 termination of his parental rights to his

biological son, A.R.K. (fictitiously "Ahmad" throughout those proceedings), were marked by

1

fraud, deceit, and conspiracy. He names as defendants the New Jersey Division of Child Protection and Permanency (DCP&P),[1] certain of its associates and employees, and other persons involved in his prior family-court dispute; he is joined in some claims by Sandra Damrah, identified in the record only as Khalil's landlord (the Court will generally refer to Khalil as the plaintiff herein, because he proceeds alone for most of the complaint). Throughout the complaint, Khalil points to scattered incidents, occurring before, during, and after the 15-day family court bench trial, that are meant to show the outlines of this conspiracy to deprive him of his rights. And according to the complaint, the conspiracy took identifiable shape two years after the conclusion of the state trial proceedings, when he and Damrah had an antagonistic encounter with a DCP&P supervisor who had been briefly involved in an investigation into Ahmad's welfare before the termination proceedings began. All defendants have moved to dismiss the complaint.

The United States Constitution recognizes a "constitutionally protected liberty interest[] that parents have in the custody, care and management of their children," but that interest is "not absolute"; it is counterbalanced by a "compelling governmental interest in the protection of children." *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997). Guardianship proceedings such as were commenced in the New Jersey Family Part are undertaken in accordance with these underlying constitutional guarantees. Thus, for example, the Supreme Court held in *Santosky v. Kramer*, 455 U.S. 745 (1982), that a state "may sever completely and irrevocably the rights of parents in their natural child" only if it supports "its allegations by at least clear and convincing evidence." *Id.* at 747–78. It is this standard that is

---

[1] Formerly the Division of Youth and Family Services ("DYFS").

applied in New Jersey when the state petitions to terminate parental rights under N.J.S.A. § 30:4C-15.1.  *N.J. Div. of Youth & Family Servs. v. K.M.*, 136 N.J. 546, 557 (N.J. 1994).

The United States Supreme Court also recognized long ago that federal courts consistently have shown special solicitude for state interests "in the field of family and family-property arrangements."  *United States v. Yazell*, 382 U.S. 341, 352 (1966); *see also Lehman v. Lycoming Cnty. Children's Servs. Agency*, 458 U.S. 502, 512 (1982).  Further, reviewing courts give deference to findings of fact—and particularly credibility determinations—made by family courts.  *See, e.g.*, *N.J. Div. of Youth & Family Servs. v. G.L.*, 191 N.J. 596, 605 (N.J. 2007).  In his complaint before this Court, Khalil has striven mightily to frame his allegations in terms of independent constitutional violations and not flawed state proceedings.  As will be seen, however, both the conclusory allegations of unconstitutional misconduct contained in the complaint and Khalil's failure to identify an injury separate and distinct from the underlying state-court judgment lead this Court to conclude that this lawsuit is barred in large part by the application of the *Rooker-Feldman* doctrine, and is otherwise without merit.  The complaint will be dismissed in its entirety.

## I. Background

The factual recitation below is generally based on the allegations of the complaint, which must be accepted as true.  *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) (per curiam).

This lawsuit, however, does not arise in a vacuum.  The Court may "on a motion to dismiss, . . . take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."  *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d

410, 426 (3d Cir. 1999). Khalil's complaint only partially recites facts about the state proceedings against Khalil and Ahmad's mother D.L. For example, the complaint omits entirely that the guardianship proceedings were filed against both D.L. and Khalil, and that Khalil was not seeking custody of Ahmad before the Family Part, but rather visitation rights and Ahmad's return to D.L's custody. The Court will therefore supplement with information from the Appellate Division opinion affirming the termination of D.L.'s and Khalil's parental rights, noting that these additional facts do not contradict the facts alleged in the complaint. *See generally Div. of Youth & Family Servs. v. M.M.K.* [hereinafter "*M.M.K.*"], Nos. A-1771-08T4 & A-1974-08T4, 2010 WL 1526321 (App. Div. Apr. 19, 2010) (per curiam), *certification denied*, 205 N.J. 97 (N.J. 2010).

A) <u>Factual and Procedural History</u>

Khalil and D.L. were married in November 2003. D.L. had three minor children from a prior marriage who lived with her. The record indicates that Khalil and D.L. separated not long after they were married (Compl. ¶¶ 19–24); by that time, there was some involvement of the family with the DCP&P. *M.M.K.*, 2010 WL 1526321, at *4.

In February 2006, police were called in response to a domestic disturbance at D.L.'s apartment complex. Khalil was arrested "based on a false allegation of domestic violence," which was later dismissed without a finding of wrongdoing. (Compl. ¶¶ 30–32.)

According to Khalil, the DCP&P seized upon the arrest as "false justification for interfering" with Khalil's parental rights, using it as an excuse to launch an investigation. (Compl. ¶ 33.) In February 2006, DCP&P removed Ahmad and the other children from D.L.'s home, asserted emergency guardianship, and imposed restrictions on Khalil's visitation rights

with Ahmad.  The agency placed Ahmad in a foster home in April, 2006, the day before he turned two years old.  (Compl. ¶¶ 34–37.)  Khalil alleges that he completed "every program" required for the "full restor[ation]" of his parental rights, to no avail.  (Compl. ¶¶ 38–44.)

It appears that DCP&P originally planned for Ahmad to be reunified with D.L. on the condition that she separate from Khalil.[2]  *See M.M.K.*, 2010 WL 1526321, at *9.  Both D.L. and Khalil were evaluated by psychologists to determine the permanency plan for Ahmad that would be in his best interests.  *See M.M.K.*, 2010 WL 1526321, at *6–8.  Ultimately, a report by Dr. Rachel Jewelewicz-Nelson recommended that Ahmad be adopted by the foster family he had been living with since April 2006, with termination of D.L.'s and Khalil's parental rights.  *Id.* at *12.  Accordingly, DCP&P sought guardianship of Ahmad for the purpose of placing him permanently with his foster family.

At the resulting bench trial, which began in June 2008 and lasted for 15 days, a Family Part judge heard from experts, caseworkers, aides, and others called by the state, and from Khalil, D.L., and their character and expert witnesses.  Khalil testified that he was not seeking custody of but rather visitation with Ahmad, whom he believed should be returned to live with D.L.  *Id.* at *14.

The family court granted guardianship to DCP&P and terminated Khalil and D.L.'s parental rights.  Ahmad's adoption went forward.  He was four and half years old at the time the guardianship litigation concluded, and the record indicates that he continues to live with his adoptive parents.  Khalil's and D.L.'s consolidated appeals were unsuccessful.  *See also Div. of*

---

[2] D.L.'s other children were not returned to her.  Two of them were placed permanently with her former husband.  The third, tragically, had committed suicide in 2005.

*Youth & Family Servs. v. M.M.K.*, No. A-1466-09T4, 2011 WL 291968 (App. Div. Feb. 1, 2011).

On November 23, 2010, two years after the trial court's bench decision, Khalil and Damrah encountered DCP&P supervisor Ezeadi Kelechi at a crowded restaurant in Paterson. Kelechi allegedly harassed and threatened them. According to the complaint, Kelechi stated in a loud voice:

> I am DYFS; he [Mohamed Khalil] is a terrorist. We [DYFS] have his son. Ha Ha. How much did you pay your lawyer, $80 Grand? And you still don't have your son. Because you never will. Because we [DYFS] will never give him back. . . . Muslim Terrorist, Bin Laden Lover. He's [Mohamed Khalil] a terrorist. Do you have bomb belt strapped on? Why don't you call your Allah La La La? You have your knife in your pocket? Are you gonna slit my throat?

(Compl. ¶¶ 107–10 (alterations generally in original).) The complaint recites that Kelechi threatened to file "baseless complaints" against Damrah and Khalil by "using" the DCP&P office against them, although proceedings had already been completed. (Compl. ¶ 112.) He told them to "go back to your country," remarking that Damrah did not "look like" she was born in the United States. (Compl. ¶¶ 110–11.) Police were summoned to the restaurant. (Compl. ¶ 113.)

The incident demonstrated to Khalil that Kelechi "knew confidential information about Mr. Khalil's case, including the exact amount which he had paid for his legal fees and the status of his case." (Compl. ¶¶ 114–15.) Khalil alleges that this was the latest event in an ongoing conspiracy to "deny [his] fundamental rights as a parent through retaliation." (Compl. ¶¶ 119–22.)

### B) <u>Allegations of the Complaint</u>

Khalil makes the following specific claims against the DCP&P and its agents:

- Defendant Geraldine Livengood, a Deputy Attorney General for New Jersey, minimized an injury Ahmad sustained in foster care, "abused process" by requiring Human Services officers to be present (in addition to the DCP&P workers already present) during Khalil's visitation time with Ahmad, and admitted during the Appellate Division oral argument that the 2006 domestic disturbance may have been unfounded—yet proceeded with the termination process anyway (Compl. ¶¶ 47–50);

- Defendant Alice Nadelman, a DCP&P psychological expert, refused to accept Khalil's exculpatory explanations, made false representations during court proceedings, and tried to dissuade Khalil's witnesses from testifying in his favor (Compl. ¶¶ 51–56);

- Defendant Kevin Belli, a DCP&P caseworker, reported a false threat, which greatly diminished Khalil's visitation time; afterwards, Belli laughed at Khalil and his situation (Compl. ¶¶ 63–66);

- An unnamed DCP&P case worker refused to let Khalil call Ahmad's grandmother during a visitation (Compl. ¶¶ 67–69);

- Defendant FIS supervised a number of encounters between Khalil and Ahmad in facilities that were cluttered, and also transported Ahmad to those visits "with no car seat, no booster seat, and no working seat belt" (Compl. ¶¶ 70–75);

- Defendant Gillian Batts, a DCP&P case worker, attempted to expedite the termination of Khalil's parental rights prior to the conclusion of judicial proceedings, requiring him to prematurely fill out adoption forms (Compl. ¶¶ 76–79);

- DCP&P staff willfully ignored problems at Ahmad's foster home, while "humiliating" Khalil in front of his son (Compl. ¶¶ 80–82);

- Defendant Janet Dasilva, a supervisor, condoned Ahmad being taken to Christian religious services despite his father's Muslim beliefs, telling Khalil that he had "no justification for concern" and acting rudely (Compl. ¶¶ 88–89);

- Defendant Arlene Cohn, Ahmad's law guardian, covered up physical abuse, misrepresented contact with Khalil to paint him in a bad light, and otherwise engaged in severe derelictions of her duty (Compl. ¶¶ 90–95); and

- Defendant Rachel Jewelwicz-Nelson,[3] a DCP&P psychological expert, "improperly" engaged in psychological testing, complained about Khalil's behavior, unjustly deemed him "narcissistic," and engaged in minimizations and misrepresentations (Compl. ¶¶ 98–106).

Khalil presents 11 enumerated grounds for relief, although some of his counts blend together. In the counts against Kelechi, Damrah joins him as plaintiff.

- Counts one and two are directed at DCP&P, Blake, and Wood (the latter two in their official capacities). Alleging violations of Khalil's First, Fourth, and Fourteenth Amendment rights, the claims are brought under 42 U.S.C. §§ 1983 and 1986, and charge the defendants with failing to promulgate rules and training to avoid constitutional violations in investigating child abuse accusations while either "tacit[ly] endorsing or explicit[ly] instructing" DCP&P employees in

---

[3] Following a Fed. R. Civ. P. 4(m) Notice of Call for Dismissal [D.E. 36], this defendant was dismissed from the suit via order [D.E. 37] entered January 10, 2014, because she was never served with the complaint.

unconstitutional procedures or tactics. Khalil requests injunctive relief "in the form of an order requiring that the explicit instruction and policy be made requiring [DCP&P] workers to refrain from abuse of process." (Compl. ¶¶ 126–39.)

- Count three, directed at all of the defendants, identifies a 42 U.S.C. § 1985 conspiracy to violate Khalil's civil rights, which "can be proven through Defendants['] incidents of abuse of process and from the repeating of that conduct in an effort to deny Mohamed Khalil his rights of due process." (Compl. ¶¶ 140–43.)

- Count four, again directed at all of the defendants, is a 42 U.S.C. § 1983 claim of violation of due process and equal protection rights, arising out of the defendants' acts that were "a moving force behind an objectively unreasonable abuse of process against Plaintiff resulting in the above-referenced constitutional violations." It also accuses the defendants of violating Khalil's Fifth Amendment right to due process, his Sixth Amendment rights to a speedy trial and the effective assistance of counsel, and his Eighth Amendment right against cruel and unusual punishments, while referencing the "implementation[] and carrying out of a policy, practice, procedure, or custom." (Compl. ¶¶ 144–50.)

- Count five follows from claim four, alleging constitutional violations (of the First, Fourth, Sixth, Eighth, and Fourteenth Amendments) through 42 U.S.C. § 1983 against all of the defendants. (Compl. ¶¶ 151–60.)

- Count six, the first brought by Khalil and Damrah together, alleges unconstitutional retaliation (in violation of the First Amendment) through 42

9

U.S.C. § 1983. (Compl. ¶¶ 161–70.)  Damrah joins in this claim because she has assisted Khalil with his pursuit of due process.

- Counts seven through eleven, brought by both plaintiffs, assert New Jersey common law tort theories and injuries under the New Jersey Civil Rights Act, N.J.S.A. § 10:6-2.  (Compl. ¶¶ 171–96.)  Counts six through ten focus on the actions of defendant Kelechi.

In counts three through eleven, Khalil demands $10,000,000 in compensatory damages and $50,000,000 in punitive damages.

### C) Defendants' Motions to Dismiss

The defendants have all moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  [D.E. 9, 11, 13.]  The state defendants, represented by the Attorney General's office, proceed together, while Nadelman and FIS are separately represented and have filed their own motions.

The state defendants argue that this Court lacks subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine; that DCP&P and the official-capacity defendants are not "persons" under § 1983 and are otherwise protected by Eleventh Amendment immunity; that the plaintiffs have failed to state a New Jersey Civil Rights Act claim or a conspiracy under 42 U.S.C. §§ 1983 or 1985; that, with the exception of the Kelechi encounter, the claims are time barred; and that the state defendants are otherwise protected by quasi-judicial immunity.  They contend more generally that the plaintiffs have failed to allege factual predicates sufficient to state a § 1983 claim.  (*See* State Defs.' Moving Br. 11.)  Nadelman and FIS raise many of the same arguments; FIS also asserts that it is not a state actor culpable under 42 U.S.C. § 1983.  (See FIS Moving Br.

21–23.)  Khalil filed three separate opposition briefs [D.E. 18–20], and each group of defendants filed a separate reply brief.  [D.E. 21, 25–26.]

## II. Jurisdiction

The defendants have alleged that the complaint is jurisdictionally defective.  The Court must resolve the jurisdictional questions before proceeding to the merits of the complaint.  *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007); *Wedgewood Vill. Pharm., Inc. v. United States*, 421 F.3d 263, 266 (3d Cir. 2005).

A) <u>Eleventh Amendment Immunity</u>

Among the defendants named in the complaint are one state entity—DCP&P itself—and two employees of the state acting in their "official capacities": Wood, the current director of DCP&P, and Blake, the current commissioner of the New Jersey Department of Children and Families.  The state defendants argue that these defendants are protected by Eleventh Amendment immunity, and thus cannot be sued.

States are shielded from suit in federal courts by the Eleventh Amendment, which has been interpreted to "bar[] *all* private suits against non-consenting States in federal court." *Lombardo v. Pennsylvania*, 540 F.3d 190, 194 (3d Cir. 2008) (emphasis added).  The cloak of immunity covers "state agencies and departments and officials when the state is the real party in interest." *Pa. Fedn. of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002).  Because "[o]fficial-capacity suits are an alternative way to plead actions against entities for which an officer is an agent," *Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002), official-capacity suits against individual state agents are also barred, subject to certain exceptions.

11

It is well established that DCP&P is a state agency protected by the Eleventh Amendment. *See, e.g.*, *Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 811–12 (3d Cir. 2010) (nonprecedential); *Palmer-Carri v. Maplewood Police Dep't*, No. 2:13-02796, 2013 WL 5574693, at *3 (D.N.J. Oct. 9, 2013) (McNulty, J.); *Coleman v. N.J. Div. of Youth & Family Servs.*, 246 F. Supp. 2d 384, 393–94 (D.N.J. 2003) (Irenas, J.). Khalil does not dispute this, but he characterizes the relief requested as prospective and injunctive, and thus allowed under the Eleventh Amendment exception of *Ex parte Young*, 209 U.S. 123 (1908).

"In *Ex [p]arte Young*, the Supreme Court carved out an exception to Eleventh Amendment immunity by permitting citizens to sue state officials when the litigation seeks only prospective injunctive relief in order to end continuing violations of federal law." *Balgowan v. New Jersey*, 115 F.3d 214, 217 (3d Cir. 1997). To determine whether *Ex parte Young* applies, a court employs a two-part test: 1) does the complaint allege an ongoing violation of federal law, and 2) is the relief sought properly categorized as prospective? *Verizon Md., Inc. v. PSC*, 535 U.S. 635, 645 (2002).

Khalil's complaint seeks millions of dollars in compensatory and punitive damages; for example, count three names DCP&P, Wood, and Blake in its collection of "defendants" against whom damages should be assessed. (*See* Compl. ¶ 140–43.) At the outset, then, to the extent that the complaint seeks monetary damages from the relevant defendants in claims three through eleven, that relief is barred by the Eleventh Amendment.

Counts one and two seek an "order requiring that the explicit instruction and policy be made requiring DYFS workers to refrain from abuse of process." While these counts do not ask for damages, it is not altogether clear that they would be permissible under *Ex parte Young*. The Court need not resolve the issue, however, because counts one and two fail on other grounds, as

discussed below.  *See Broselow v. Fisher*, 319 F.3d 605, 607 (3d Cir. 2003) (allowing a court to reach antecedent jurisdictional questions before resolving Eleventh Amendment issues).

## B) The *Rooker-Feldman* Doctrine

### 1) The *Rooker-Feldman* Test

Drawing its name from two Supreme Court cases,[4] the *Rooker-Feldman* doctrine limits the subject matter jurisdiction of the lower federal courts by prohibiting them from reviewing state-court decisions, subject to certain statutorily enumerated exceptions.  *See Centifanti v. Nix*, 865 F.2d 1422, 1426 (3d Cir. 1989); *see also Blake v. Papadakos*, 953 F.2d 68, 71 n.2 (3d Cir. 1992) (identifying the habeas corpus power as one such exception).  The Supreme Court in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), significantly narrowed *Rooker-Feldman*.  *See id.* at 284.  However, the doctrine still serves to bar federal complaints that arise out of state-court judgments and ask a federal court to review and set aside that state-court judgment.  *Id.*

> Under the relevant post-*Exxon* Third Circuit test:
>
> there are four requirements that must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused by [the] state-court judgments"; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments. . . . . The second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim.

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010).

---

[4] *D.C. Ct. of App. v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

"When subject matter jurisdiction is challenged under [Fed. R. Civ. P.] (b)(1), the

plaintiff must bear the burden of persuasion." *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406,

1409 (3d Cir. 1991). If a jurisdictional challenge has factual elements, "no presumptive

truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will

not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

*Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *accord Anjelino v.

N.Y. Times Co.*, 200 F.3d 73, 87 (3d Cir. 1999). As will be seen below, even if the Court were to

assume that the defendants are mounting a facial challenge—and that the more forgiving

standard of Fed. R. Civ. P. 12(b)(6) was to be employed—this complaint does not survive.

2) Application of *Rooker-Feldman*

Here, the first and third parts of the *Great Western* test are easily satisfied: Khalil lost his

parental rights in state-court proceedings that concluded before he filed suit.[5] Hence, the

linchpin of the Court's analysis is whether the alleged injuries flowed from the state-court

judgment and whether the Court is being asked to review that judgment. That focus is as it

should be; as the Third Circuit has said, "[t]he second and fourth requirements are the key to

determining whether a federal suit presents an independent, non-barred claim." *Great W.*, 615

F.3d at 166. And *Great Western* explained that the second requirement, "that a plaintiff must be

complaining of injuries caused by a state-court judgment," can be considered "an inquiry into the

source of the plaintiff's injury." *Id.* In other words, "[t]he critical task is thus to identify those

---

[5] Although there is "some disagreement as to when a state proceeding has sufficiently 'ended' to trigger *Rooker-Feldman*," in the present case the complaint was filed long after the New Jersey Supreme Court denied certification and proceedings wound to a close; thus, even under the strictest version of the test, the doctrine would apply. *See Bruno v. Sup. Ct. of Pa.*, 946 F. Supp. 2d 392, 396 (E.D. Pa. 2013). Thus, to the extent that Khalil attacks the outcome of state appellate proceedings, *Rooker-Feldman* is appropriately invoked.

federal suits that profess to complain of injury by a third party, but actually complain of injury produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 167 (internal quotations & citations omitted).

In the complaint, Khalil does profess to complain of injury caused by various third parties. But despite being full of allegations of purportedly unconstitutional conduct by these third parties, the complaint is strikingly devoid of specific articulations of harm.

The allegations against defendant Livengood illustrate this deficiency. Livengood is supposed to have "falsely alleged" that Khalil's stepson committed suicide. (Compl. ¶ 47.) Livengood also acted in ways that "resulted in the permanent end of" Khalil's visitation rights, and "demonstrated abuse of process" by requiring two additional officers to be present at visitations, thereby "resulting in duplication of services without cause." (Compl. ¶¶ 48–49.) Finally, Livengood "stated in the Appellate Division oral argument that . . . Khalil never harmed or neglected his child" but "proceeded with the termination of . . . Khalil's parental rights" anyway. (Compl. ¶ 50.) When allegations that are purely conclusory, or that merely label conduct unconstitutional, are sifted away, a question remains: how did Livengood's conduct actually result in harm to Khalil? The ultimate harm—the loss of Khalil's parental rights—was brought about *by the state-court judgment* and *not* Livengood's actions during the course of the state-court proceedings. As the complaint explicitly states, "[i]t was the actions of" defendants such as Livengood that "resulted in the termination of [Khalil's] parental rights." (Compl. ¶ 46.)[6] Khalil is strategically framing his grievances, professing to complain of third-party

---

[6] Khalil also attacks the testimony of witnesses at the bench trial and the reports of experts that were presented to the judge. (See Compl. ¶¶ 51–55.) In ruling against Khalil in what the Appellate Division described as a "comprehensive oral decision," the Family Part judge found the witnesses and expert conclusions presented by the state to be credible and persuasive. Khalil

injuries when, in reality, he complains of injuries caused by a state-court judgment, as entered by the Family Part and affirmed on appeal. Under both *Great Western* and *Exxon*, this is prohibited by *Rooker-Feldman*.

The complaint also fails to articulate colorable constitutional violations that could be the source of separate injuries. The Third Circuit explained in *Great Western* that suits asserting independent constitutional violations—such as "fraud" or "misrepresentation"—occurring in the course of a judicial proceeding are not barred by *Rooker-Feldman*. *See Great W.*, 615 F.3d at 167–68 (discussing *McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006)). *Great Western* itself presented the example of a plaintiff who alleged a conspiracy between various defendants and the Pennsylvania judiciary. But here, Khalil does not sufficiently connect the individual wrongs he alleged to any particular constitutional right that was violated, outside of a blanket "due process" concern. *See Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) ("To state a claim under § 1983, plaintiffs must show that the defendant, under the color of state law, deprived them of a federal constitutional or statutory right.").[7] Khalil's grievances do not

---

does not plead that he lacked a fair opportunity to litigate these issues of credibility, or the complained-of evidential rulings, at his trial. And at that trial, the state had the burden of proving the termination case by "clear and convincing" evidence, a stricter standard than the one applicable to § 1983 civil suits. As a result, if subject-matter jurisdiction actually existed, the Court is satisfied that these challenges would be barred by the doctrine of collateral estoppel. *See N.J. Div. of Youth and Fam. Servs. v. R.D.*, 207 N.J. 88, 113–15 (2011) (discussing burdens of proof and New Jersey collateral estoppel test); *see also Burlington N. R.R. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231–32 (3d Cir. 1995) (articulating Third Circuit collateral estoppel test).

[7] Khalil invokes the Fifth Amendment, but the due-process guarantee of the Fifth Amendment applies only to the federal government. The Fourteenth Amendment secures an identical right with regard to the individual states. *See Citizens for Health v. Leavitt*, 428 F.3d 167, 178 n.11 (3d Cir. 2005). Khalil also raises the Sixth Amendment's guarantees of counsel and speedy trial, and the Eighth Amendment's prohibition on cruel and unusual punishment, but does not explain how they would apply here.

coalesce into a legal challenge grounded in the constitution; they remain a scattershot collection of slights, disagreements, and deficiencies sounding in negligence or implicating violations of New Jersey procedural requirements. To the extent that Khalil is attempting to "constitutionalize" claims of fraud, retaliation, conspiracy, harassment, and misrepresentation, all of the underlying claims are clearly barred by the applicable statutes of limitations on 42 U.S.C. §§ 1983, 1985, and 1986 claims (generally, two years, except for one year in the case of 42 U.S.C. § 1986 claims). *See Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (citing N.J.S.A. § 2A:14-2); *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 79 (3d Cir. 1989). Khalil frames his accusations, in the alternative, as demonstrating an ongoing constitutional conspiracy "to deny . . . fundamental rights as a parent through retaliation" done "solely to harass and retaliate . . . for asserting . . . civil rights." (Compl. ¶¶ 119, 122.) But trying to cure the untimeliness this way leads inescapably to the *object* of the alleged conspiracy: the termination of Khalil's parental rights and the true source of his injury. Awarding millions of dollars and granting injunctive relief may be how Khalil asks this Court to rectify the injury, but it is inescapably the state-court judgment that the Court would be reviewing and functionally setting aside.

Nor do the "individual" claims against the various defendants pass muster outside of the context of the limitations period. As the defendants point out, many of the activities and individuals targeted by the complaint would be covered by absolute immunity—*see, e.g.*, *B.S. v. Somerset County*, 704 F.3d 250, 266–70 (3d Cir. 2013); *Melleady v. Blake*, No. 11-1807, 2011 WL 6303245, at *15 (D.N.J. Dec. 15, 2011) (Hillman, J.)—or qualified immunity, *see Pearson v. Callahan*, 555 U.S. 223, 232 (2009). *See also Rehberg v. Paulk*, 132 S. Ct. 1497, 1505 (2012) (discussing the "absolute immunity" of trial witnesses sued under § 1983).

Khalil's allegations fail to connect the asserted wrongs to injury that is separate and distinct from the termination of Khalil's parental rights in the state court. Khalil has linked the defendants' alleged wrongdoing to events too far in the past to have legal significance; to actors who enjoy immunity from suit; and to claimed constitutional violations expressed in vague, conclusory, and often inapplicable terms. It is clear to that the complaint would have this Court interfere with a long-concluded family court proceeding that—aside from the traditional deference it is afforded—demonstrably gave Khalil an extensive amount of process and opportunity to advocate for his position. The true target of the complaint is how the state court ruled.

Accordingly, the Court concludes that the majority of the complaint is barred by operation of the *Rooker-Feldman* doctrine.[8] The Court therefore moves on to the counts arising from the encounter with defendant Kelechi, which are not barred by *Rooker-Feldman* because they arise from conduct occurring after the state court judgment was final. The Court may reach those counts under 28 U.S.C. § 1331.

### III. The Kelechi Claims

Along with the other defendants, Kelechi is named in counts three through six, pertaining to activity that allegedly violated the United States Constitution, and count eleven, pertaining to activity that allegedly violated the New Jersey Constitution. He is the primary target of counts seven through eleven, which arise under New Jersey law.

As an individual defendant, Kelechi is not protected by the Eleventh Amendment, and the incident in which he was involved falls just within the two-year limitations period due to the

---

[8] And, as the foregoing analysis demonstrates, even if the Court were to have jurisdiction, the claims would fail on the merits for the reasons expressed above.

operation of federal court holidays. But despite being facially timely, the federal claims against Kelechi are deficient because the plaintiffs do not establish how the encounter in the restaurant amounted to constitutional violations under the First, Fourth, Fifth, Sixth, Eighth, or Fourteenth Amendments, as is alleged in counts five and six. Not all torts "rise to the level of constitutional violations." *White v. Napoleon*, 897 F.2d 103, 114 n.4 (3d Cir. 1990); *see also Burkholder v. Newton*, 116 F. App'x 358, 360 (3d Cir. 2004) ("Section 1983 claims are based on constitutional violations and have a different threshold level than a simple tort action."). That the plaintiffs plead that Kelechi violated their constitutional rights does not suffice under a Fed. R. Civ. P. 12(b)(6) analysis, because the "Federal Rules of Civil Procedure require that a plaintiff assert more than mere labels and conclusions." *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009) (per curiam). If the plaintiffs intend to suggest that Kelechi's participation in the single encounter connects to some of the *other* conduct alleged as unconstitutional in the complaint, they have failed to plead facts sufficient to show Kelechi's plausible involvement in any of that other complained-of conduct under the now-familiar *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), standard. *See Birdman v. Office of the Governor*, 677 F.3d 167, 171 (3d Cir. 2012). Further, the plaintiffs do not plead that Kelechi had any "personal involvement" in the complained-of conduct from the state-court proceedings. And without personal involvement, there can be no constitutional liability. *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007).

In addition to the substantive constitutional claims alleged, the plaintiffs also articulate claims of constitutional conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986. Allegations of conspiracy do not preserve claims that are otherwise time barred, because a civil conspiracy cause of action accrues at the time of each overt act challenged. *See Wells v. Rockefeller*, 728

19

F.2d 209, 217 (3d Cir. 1984).  The plaintiffs certainly knew of their injury before their encounter with Kelechi.  *Cf. Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir. 1982) (per curiam) (with regard to a claim alleging a conspiracy to secure false testimony, contemporaneous knowledge of false testimony led to accrual of cause of action, even if the plaintiff "may not have known all the facts necessary" to establish a conspiracy).  Thus, to the extent that the plaintiffs wish to "revive time-barred injuries" through allegations of conspiracy, they may not do so.  *Wells*, 728 F.2d at 217; *see also Graff v. Kohlman*, 28 F. App'x 151, 154 (3d Cir. 2002) (rejecting the contention that later conduct "establishe[d] a 'continuing conspiracy' against [the plaintiff] that makes his April 4, 1999 filing timely" for harms dating from 1992 and 1993).

Moreover, the Court finds that the conspiracy claims are not well pleaded.  "To demonstrate a conspiracy under § 1983, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'" *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir. 1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003).  A claim under 42 U.S.C. § 1985(3)—the only subsection of that statute applicable here— requires "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."  *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983).  A § 1986 claim must be based on a preexisting § 1985 claim.  *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).  "[T]he bare allegation of an agreement is insufficient to sustain a conspiracy claim."  *Brown v. Deparlos*, 492 F. App'x 211, 215 (3d Cir. 2012) (per curiam) (citing *Abbott v.*

*Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998)); *see also Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991) (affirming the dismissal of "conspiracy claims [that] do not appear to be based in fact, but merely upon . . . own suspicion and speculation").  It is significant that the encounter describes an unpleasant but unplanned incident where Khalil and Kelechi literally bumped into one another at a time and place unrelated to Kelechi's position at or Khalil's involvement with the DCP&P (then DYFS).  That Kelechi recited a dollar figure that purportedly reflected the amount Khalil spent on legal fees does not advance the notion of a conspiracy beyond the level of speculation.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Court finds that the plaintiffs have failed to state federal claims against Kelechi that can survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss.  Accordingly, those federal claims fail.

## IV. Conclusion

For the foregoing reasons, the defendants' motions to dismiss are granted.  As to the state law claims, the Court declines to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) and they are dismissed.  An appropriate order dismissing the complaint and directing the Clerk to close this case will be entered.

January 31, 2014                                     /s/ Katharine S. Hayden
                                                     Katharine S. Hayden, U.S.D.J.